# EXHIBIT B

Stuart Zisholtz, Esq.
ZISHOLTZ & ZISHOLTZ, LLP
200 Garden City Plaza, Suite 408
Garden City, New York 11530
Tel: 516-741-2200
Fax: 516-746-1024
stu@zzllp.com
*Attorneys for Shalom S. Maidenbaum*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

SHALOM S. MAIDENBAUM

Plaintiff,

-against-

AARON FISCHMAN, NINA FISCHMAN,
LAWRENCE KATZ, THE LAW OFFICE
OF LAWRENCE KATZ, P.C., THE LAW
OFFICE OF LAWRENCE KATZ, ESQ.,
PLLC, and CHOSHEN ISRAEL GROUP,
LLC,

Defendants.

-------------------------------------------------------------x

Civil Case No.2:18-CV-02911
(JFB-GRB))

**DECLARATION OF
STUART S. ZISHOLTZ**

**Stuart S. Zisholtz**, being an attorney-at-law duly licensed to practice law in the State of New York and a member to the firm of Zisholtz & Zisholtz, LLP, attorneys of record for the Plaintiff in the above entitled action declares as follows pursuant to 28 U.S.C. § 1746:

1.       I make this declaration in opposition to Defendants' motions for an Order pursuant to FRCP Rule 12(b)(6), FRCP 12(e), FRCP 8(a) FRCP 9 (a)-(d) and FRCP Rule 11.

2.       The legal arguments are clearly laid out in the Memorandum of Law in opposition to the Motions filed by the Defendants. They will not be repeated herein in their entirety.

3.       Annexed hereto and made a part hereof as Exhibit "A" is a copy of the complaint filed by the New York State Attorney General.

## THE DEFENDANTS ACTIONS ARE EGREGIOUS

4.    The Defendants rely upon various emails exchanged between myself and counsel for the Defendants to try and establish their entitlement to a dismissal of this action.

5.    The emails were exchanged during settlement discussions between myself and Levi Huebner, Esq,, counsel for the Defendants. Clearly, such communications are not admissible.

6.    Moreover, at the time the complaint was filed, I was under the mistaken impression that the judgments entered by the Plaintiff were the same damages requested in this action. I subsequently learned that such information is incorrect.

7.    The Plaintiff was not only an investor in Cardis and its various entities but also loaned money to Cardis and Aaron Fischman. The loans, for which promissory notes were executed, resulted in Mr. Fischman and the Cardis entities executing confessions of judgments. Those confessions of judgments were filed with the Clerk of the Court and resulted in judgments being entered in the aggregate sum of $3,274,540.78.

8.    Separate and apart from the entered judgments is the claim filed herein by the Plaintiff that funds earmarked for Cardis and EPoint were diverted to Nina Fischman and others. The invested money was given to the Defendant, Lawrence Katz and placed into his attorney escrow account for the sole purpose of investing in Cardis and EPoint.

9.    The Defendants are fully aware that the loans and the investment money were separate and distinct. Yet, the Defendants are attempting to mislead this Court into believing that the judgments form the basis for this action. Their irresponsible and deceiving actions should not be condoned.

10.  The complaint lays out clearly and unequivocally the improper and fraudulent scheme perpetrated by the Defendants.

11.  In the event, however, the Court finds that the Complaint does not clearly allege the underlying facts necessary to establish the claims asserted, it is respectfully submitted that the Plaintiff be granted leave to amend the complaint.

**WHEREFORE**, your affiant respectfully prays for an order denying Plaintiff's Motion in all respects.

Stuart S. Zisholtz (7532)

Subscribed this 4th
day of January, 2019

3

EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,
by BARBARA D. UNDERWOOD,
Attorney General of the State of New York,

                     Plaintiff,

         -against-

AARON D. FISCHMAN, STEPHEN BROWN,
STEVEN HOFFMAN, LAWRENCE KATZ,
SETH ROSENBLATT, CARDIS ENTERPRISES
INTERNATIONAL N.V., CARDIS ENTERPRISES
INTERNATIONAL (U.S.A.) INC.,
CARDIS ENTERPRISES INTERNATIONAL B.V.,
CHOSHEN ISRAEL LLC, LAW OFFICES OF
LAWRENCE KATZ, ESQ. PLLC, LAW OFFICES OF
LAWRENCE KATZ P.C., and ZERP LLC,

                  Defendants,

        -and-

NINA FISCHMAN, RAFAELA FISCHMAN,
ALEXANDER FISCHMAN, STUART FISCHMAN,
ANNE SHIMANOVICH, and ETHEL WEISSMAN,

                Relief Defendants.

------------------------------------------------------------------------X

**SUMMONS**

Index No. _____

Plaintiff designates
New York County as the
place of trial.

TO THE ABOVE-NAMED DEFENDANTS:

     **YOU ARE HEREBY SUMMONED** to answer in this action and serve a copy of your

answer, or if the complaint is not served with the summons to serve a notice of appearance, on

the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of

the day of service.  If this summons is not personally served upon you, or if this summons is

served upon you outside of the State of New York, then your answer or notice of appearance

must be served within thirty (30) days.  In case of your failure to appear or answer, judgment will be taken against you by default, for the relief demanded in the complaint.

Dated: December 21, 2018
       New York, New York

BARBARA D. UNDERWOOD
Attorney General of the State of New York

By: _____

    Jeffrey A. Novack
    Assistant Attorney General
    Investor Protection Bureau
    (212) 416-6178
    jeffrey.novack@ag.ny.gov

    Mary Kay Dunning
    Senior Enforcement Counsel
    Investor Protection Bureau

    Verle Johnson
    Assistant Attorney General
    Investor Protection Bureau

*Attorneys for Plaintiff*
*People of the State of New York*

Of Counsel:

Cynthia Hanawalt
Bureau Chief
Investor Protection Bureau

INDEX NO. 452353/2018

RECEIVED NYSCEF: 12/21/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,
by BARBARA D. UNDERWOOD,
Attorney General of the State of New York,

Plaintiff,

**COMPLAINT**

-against-

Index No. _____

AARON D. FISCHMAN, STEPHEN BROWN,
STEVEN HOFFMAN, LAWRENCE KATZ,
SETH ROSENBLATT, CARDIS ENTERPRISES
INTERNATIONAL N.V., CARDIS ENTERPRISES
INTERNATIONAL (U.S.A.) INC.,
CARDIS ENTERPRISES INTERNATIONAL B.V.,
CHOSHEN ISRAEL LLC, LAW OFFICES OF
LAWRENCE KATZ, ESQ. PLLC, LAW OFFICES OF
LAWRENCE KATZ P.C., and ZERP LLC,

Defendants,

-and-

NINA FISCHMAN, RAFAELA FISCHMAN,
ALEXANDER FISCHMAN, STUART FISCHMAN,
ANNE SHIMANOVICH, and ETHEL WEISSMAN,

Relief Defendants.

-----------------------------------------------------------------------X

1.     Plaintiff, the People of the State of New York, by Barbara D. Underwood,

Attorney General of the State of New York, alleges the following against:  (a) Defendants Aaron

D. Fischman, Stephen Brown, Steven Hoffman, Lawrence Katz, Seth Rosenblatt, Cardis

Enterprises International N.V., Cardis Enterprises International (U.S.A.) Inc., Cardis Enterprises

International B.V., Choshen Israel LLC, Law Offices of Lawrence Katz, Esq. PLLC, Law

Offices of Lawrence Katz P.C., and Zerp LLC (the "Defendants"); and (b) Relief Defendants

Nina Fischman, Rafaela Fischman, Alexander Fischman, Stuart Fischman, Anne Shimanovich, and Ethel Weissman (the "Relief Defendants").

## NATURE OF THE ACTION

2. From 1998 to present, Defendant Aaron D. Fischman operated the Cardis entities – Defendant Cardis Enterprises International N.V. ("Cardis NV"), Defendant Cardis Enterprises International B.V. ("Cardis BV"), and Defendant Cardis Enterprises International (U.S.A.) Inc. ("Cardis USA") (together, "Cardis" or the "Company").

3. Cardis claimed to possess patented and proprietary technology to make low-value credit card transactions less expensive for merchants. Credit card transactions include a fixed fee, regardless of the size of the transaction, which has the effect of severely depressing margins on low-value transactions. For example, a $1 credit card purchase at a convenience store might incur a fixed processing cost of $0.10 for the store. Cardis claimed that its technology allowed merchants to aggregate low-value transactions, so that this fixed fee would be incurred less frequently.

4. Cardis solicited tens of millions of dollars from investors by selling stock in Cardis NV. Although Cardis did not maintain full shareholder records, Defendant Fischman has represented that Cardis raised over $70 million, and a Cardis-maintained share registry reflects at least $30 million in stock sales since 2011. Cardis also raised significant funds through loans.

5. Cardis was a fraud. It raised money through a steady drumbeat of false representations that: (1) it was on the verge of monetizing its technology through agreements with prominent companies; and (2) an initial public offering ("IPO") or buyout of Cardis was on the horizon. All the while, Defendant Fischman diverted investor moneys to enrich himself, family members, and favored charities. While the particulars of the fraud varied, these acts and

2

INDEX NO. 452353/2018

RECEIVED NYSCEF: 12/21/2018

practices were part of a single, continuing scheme to deceive investors and enrich Defendant Fischman. Defendant Fischman was aided in these efforts by the other Defendants.

6.     Many Cardis investors were particularly vulnerable to Defendants' fraud because they were members of a close-knit religious community, to which many of the Defendants also belonged, located in the New York metropolitan area.

7.     Although centered in New York, Cardis' fraud was far-reaching. It ensnared investors with relatively modest means, as well as individuals with substantial fortunes. Cardis deceived investors of all levels of sophistication, including highly sophisticated business people and attorneys. And it lured many investors to make repeat investments in the Company.

## PARTIES

8.     Plaintiff brings this action by and through Attorney General Barbara D. Underwood.

9.     The Attorney General is the chief law enforcement officer of the State of New York and is charged by law with protecting the integrity of the business and securities markets within New York, as well as the economic health and well-being of investors who reside or transact business in the State.

10.     The Attorney General is authorized to bring this action and to assert the causes of action set forth below pursuant to General Business Law § 352 et seq. (the "Martin Act") and Executive Law § 63(12), and under the common law pursuant to the Attorney General's *parens patriae* authority.

11.     Defendant Cardis BV was incorporated in the Netherlands in 1996.

12.     Defendant Cardis NV was incorporated in Curaçao under the former laws of the Netherlands Antilles in or around 2006. The principal place of business of Cardis NV is the

3

Country of Curaçao, a Lesser Antilles island that is a constituent country of the Kingdom of the Netherlands.

13. Defendant Cardis USA was incorporated in Delaware on June 20, 2013 and registered to do business in New York State on June 27, 2013. At all relevant times, its principal place of business was located at 445 Central Avenue, Cedarhurst, New York, 11516, and it was a wholly owned subsidiary of Cardis NV. The current entity status of Cardis USA for the conduct of business in New York State is "suspended," according to the website of the Division of Corporations of the New York State Department of State.

14. The Cardis entities did not observe customary corporate formalities. Instead, they: (1) had no independent capitalization; (2) shared personnel; (3) were dominated by Defendant Fischman, who controlled the terms of deals with investors, the use of the proceeds, and Cardis' third-party relationships; and (4) were employed to further the fraud conceived by Defendant Fischman. For that reason, the Cardis entities are simply referred to as "Cardis" throughout this Complaint.

15. Defendant Choshen Israel LLC ("Choshen") is a New York limited liability company formed on January 4, 1999, with its principal place of business at relevant times at 445 Central Avenue, Cedarhurst, New York, 11516. Choshen is controlled by Defendant Fischman, and Defendant Fischman received payments from Cardis through Choshen. Many investors' investments in Cardis were through subscription agreements with Choshen.

16. Defendant Law Offices of Lawrence Katz, Esq. PLLC is a New York professional service limited liability company formed on February 29, 2012 by Defendant Katz for his practice of law. Prior to becoming inactive on January 25, 2012, Law Offices of Lawrence Katz

4

P.C. was the law firm through which Defendant Katz engaged in the fraudulent and illegal acts and practices described herein.

17.    Defendant Zerp LLC is a New York limited liability company, formed by Defendant Steven Hoffman and registered to his home in Lawrence, New York. It received payments on Defendant Hoffman's behalf.

18.    Defendant Aaron D. Fischman was, at all relevant times, a principal, officer, director, and/or control person of Cardis NV, Cardis USA, and Cardis BV. Defendant Fischman formally served as Cardis' Chief Executive Officer until 2016 but continued to exercise control over Cardis thereafter.

19.    Defendant Stephen Brown was, at relevant times, the most senior financial executive at Cardis and was variously described as its Chief Financial Officer, Vice President of Finance, and/or Senior Financial Executive.

20.    Defendant Seth Rosenblatt was, at relevant times, a director of a Cardis subsidiary, Cardis R&D Ltd., and a director of Choshen.

21.    Defendant Steven Hoffman was, at relevant times, an agent of Cardis NV authorized by that company to offer and sell its securities to the public in and from New York State.

22.    Defendant Lawrence Katz, Esq. is, and was at relevant times, a member of the bar of the State of New York. At relevant times, Defendant Katz maintained Interest on Lawyer Account ("IOLA") bank accounts for the benefit of Defendants Cardis NV and Cardis USA. Defendant Katz deposited investor moneys into his firms' bank accounts in connection with his participation in the fraudulent investment schemes described herein.

23.    Relief Defendant Nina Fischman is the spouse of Defendant Fischman.

5

24.     Upon information and belief, the other Relief Defendants – Rafaela Fischman, Alexander Fischman, Stuart Fischman, Anne Shimanovich, and Ethel Weissman – are all family members of Defendant Fischman.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action, personal jurisdiction over the Defendants and Relief Defendants, and authority to grant the relief requested pursuant to General Business Law § 352 et seq., Executive Law § 63(12), and the common law.

26.     Pursuant to C.P.L.R. § 503, venue is proper in New York County, because Plaintiff resides in that county, and because a substantial part of the events and omissions giving rise to the claims occurred in that county.

## FACTUAL ALLEGATIONS

27.     Since 1998, Cardis obtained tens of millions of dollars from investors through sales of stock, warrants, and convertible notes – all of which are securities under GBL § 352(1). Cardis offered and sold these securities to more than one hundred investors.

28.     Cardis was tightly controlled by Defendants Fischman, Brown, Katz, Hoffman, and Rosenblatt, who worked together in a small office space, on a single floor, in Cedarhurst, New York.

29.     Defendant Fischman was a founder of Cardis and ran it through his own company, Defendant Choshen. Defendant Fischman personally raised significant funds for Cardis based on false representations and omissions, prepared key investor marketing materials that were also false, and was the primary decision maker in Cardis' pursuit of revenue generating third-party relationships.

6

30.     Defendant Katz was Cardis' in-house counsel and controlled a number of Cardis

bank accounts, including Cardis' principal bank account, which was in the name of his law firm.

Defendant Katz abused this role by aiding in Defendant Fischman's theft from the Company and

by diverting Company moneys to himself.

31.     Defendant Brown was Cardis' senior financial officer.  His principal role at

Cardis was to draft and send investor update letters, which contained a host of false statements

and omissions, based on information provided by Defendant Fischman.  Many Cardis investors

made additional investments in Cardis in reliance on these letters.

32.     Defendant Hoffman was one of Cardis' principal fundraisers raising, upon

information and belief, over $20 million from investors.  Defendant Hoffman operated on a

commission basis with investment-based commissions directed to him or his company,

Defendant Zerp LLC.  Defendant Hoffman relied on the investor updates prepared by Defendant

Brown and information from Defendant Fischman – both of which contained material

misstatements and omissions – in making his pitches to investors.

33.     Defendant Rosenblatt operated under the direction of Defendant Fischman and

had significant responsibilities in interacting with investors.  Defendant Rosenblatt distributed

false investor update letters prepared by Defendant Brown, which Defendant Rosenblatt was also

on the distribution list to receive.  Defendant Rosenblatt also frequently interacted with investors

via email and telephone.

34.     Cardis induced investors to purchase shares of stock in Defendant Cardis NV by

means of material misstatements and omissions of material facts in both oral and written

communications, including, but not limited to, emails, text messages, telephone calls,

PowerPoint presentations, investor update letters, subscription agreements, and private

7

placement memoranda.

35.     These misrepresentations and omissions centered on:  (1) Cardis' business prospects; (2) Defendant Fischman's exploitation of Cardis for personal benefit; and (3) Cardis' key personnel.

36.     The Defendants were obligated, and failed, to correct or update these misleading statements and omissions.  Instead, since at least 2012 and continuing to the present, Defendants reaffirmed their false statements and omissions and covered up their malfeasance, even when confronted by concerned investors.

I.     **Defendants' Misrepresentations and Omissions Concerning Cardis' Business Prospects**

37.     As detailed below, Cardis misrepresented its business prospects in two principal respects:  (1) Cardis falsely claimed it was on the verge of revenue-generating relationships; and (2) Cardis falsely claimed that an IPO or buyout was on the horizon.

A.     **Cardis' Third-Party Relationships**

38.     As discussed above, Cardis claimed to possess proprietary technology to aggregate low-value credit card transactions.

39.     Cardis' business plan generally centered on generating revenue from third parties who participated in low-value transactions – either in the financial services industry (like banks and credit card companies) or as merchants (like convenience stores).

40.     These parties could potentially benefit from the ability of Cardis' technology to lower the costs of low-value transactions in two principal ways:  (a) through increased acceptance and use of credit cards, resulting in a net benefit to the financial services industry; and (b) through benefits to merchants by lowering their direct costs.

8

41.    In turn, these third parties could compensate Cardis based on the revenue or savings generated by Cardis' technology.  Because Cardis' technology was focused on saving pennies on small dollar transactions, for Cardis to be successful, it would need to achieve large scale use of its technology.

42.    Consistent with this premise, Cardis sought to develop partnerships with prominent companies that operated on a large scale and were regularly involved in low-value transactions, including businesses involving financial services, vending machines, online music, parking, and convenience stores.

43.    The potential to generate revenue through these types of partnerships was equally central in Cardis' pitch to investors.

44.    From at least 2011 to present, Cardis has presented itself to investors as being on the verge of monetizing its technology through these types of partnerships.

45.    During that period, Cardis touted at least 15 partnerships – many with brand-name companies – and led investors to believe that it was on the precipice of earning enormous profits.

46.    In fact, Cardis repeatedly overstated the strength of its third-party relationships, which Cardis' business model depended upon, many of which did not advance beyond preliminary discussions.

47.    The third parties included:  Raiffeisen Bank (Austrian Bank); Sberbank (Russian Bank); Mastercard (financial services company); Spindle (smart vending machine company); Roc Nation (entertainment company); LISNR (technology company); PrimaryWave (entertainment company); PureSolo (music mobile application); All Def Digital (media company); ByStorm Entertainment (media company); Sony Music (music company); Warner Music (music company); Universal Music (music company); Municipal Parking Services

9

(provider of smart parking meter apps and other parking-related services); and Cumberland Farms (chain of convenience stores and gas stations).

48.      Defendants' written material misstatements and omissions, which generally tracked Defendants' oral representations, included statements concerning each of these third parties.

49.      *Raiffeisen, Sberbank, and Others.* On December 12, 2012, a Cardis employee emailed a prospective investor, noting that Cardis had signed a "commercial contract with Raiffiesen [sic] for implementation in Austria in 2012." Cardis also stated that it had a "[s]igned LOI" (letter of intent) and was in "contract negotiations with Sberbank – Russia (2012 implementation)." Cardis stated further that it was in discussions or engaged with a number of other companies. Cardis juxtaposed these relationships with a projected profit and loss summary, prepared by Defendant Brown, which estimated over $9 million in revenue in 2013, $18 million in 2014, and over $1 billion in revenue by 2023.

50.      In actuality, there was no basis for these projections based on Cardis' then-existing relationships, which were entirely preliminary in nature. For example, Cardis' relationship with Raiffeisen never advanced beyond a pilot program.

51.      *Spindle.* On August 15, 2013, in a letter to investors, Defendant Brown represented the following: "Cardis expects to be seeing revenues from the vending machine opportunity in its joint venture with Spindle as early as January 2014. To understand the enormity of this one specific opportunity, Spindle's contacts in the vending machine business alone can give Cardis access to over one million vending machines by 2015 with Cardis' share of the potential profit from these machines being in excess of $25M of free cash flow per year."

52.      In actuality, at the time of the letter, there was no joint venture. Nor was there

10

ever a joint venture between Cardis and Spindle. Cardis and Spindle had only entered into a mutual confidentiality agreement and letter of intent. Moreover, no work had been done to integrate Cardis' technology, and Cardis' technology was never incorporated into Spindle.

53.     *Roc Nation/LISNR.*  From February 2014 through June 2016, Defendants repeatedly represented that:  (1) Cardis had agreements with both Roc Nation and LISNR; (2) LISNR would host a Roc Nation mobile store that would embed Cardis' technology; and (3) the Roc Nation store would soon be rolled out.

54.     For example, on December 24, 2014, Defendant Rosenblatt and another Cardis employee emailed to investors a letter written by Defendant Brown, based on information originally provided by Defendant Fischman, which represented the following:  "ROC NATION - expected to go live January/February 2015 . . . Cardis is to be the official payment system for Roc Nation's on-line store and mobile apps showcasing 20 of Roc Nation's artists, including Rianna [sic] and JCole.  We have done a Beta Pilot of the site and we recently received a demo which has been successfully reviewed by our technical staff.  We received comments from Roc Nation on the final contract are [sic] we are close to finalizing."

55.     In actuality, Cardis never signed any agreement with Roc Nation, and its agreement with LISNR was solely a statement of work to create a mobile application.  Neither LISNR nor Roc Nation ever agreed that LISNR would host a Roc Nation mobile store.  The Roc Nation/Cardis store was never close to launching.  LISNR never even released the application to Cardis because Cardis failed to pay LISNR for its work.

56.     *Sony, Warner, and Universal.*  From March 2014 to December 2014, Defendants represented in written communications that Cardis would soon finalize agreements with each of the three major music labels:  Sony, Warner, and Universal.  For example, in May 2014,

11

Defendant Brown claimed that Cardis would be finalizing its agreement with all three major labels within the following 30 to 60 days.

57.     In actuality, Cardis did not advance beyond high-level preliminary discussions with these music labels, and there was no basis to represent that Cardis would soon finalize agreements with the labels.  For example, at the time of Defendant Brown's representation, only one introductory meeting between Cardis and each music company had taken place, and the parties had not even executed non-disclosure agreements.

58.     *Mastercard.*  From March 2014 through December 2014, Defendants repeatedly represented in written communications that Cardis' technology would be integrated into Mastercard, that Mastercard believed that Cardis was central to its ambitions in the music industry, and that Mastercard was contemplating a significant investment in Cardis.

59.     For example, on May 6, 2014, Defendant Fischman wrote:  "The head of MC global endorsements told me that music is the cornerstone of MC's global strategy and that Cardis is strategy [sic] to achieve this . . . We got something hot!!"

60.     In actuality, Cardis and Mastercard never materially advanced beyond technical discussions as to the feasibility of integrating Cardis' technology into Mastercard.  Mastercard did not view Cardis as key to its strategy in the music industry.  In fact, a partnership with Cardis could have jeopardized Mastercard's significant relationship with Apple because Cardis sought to create a Roc Nation music store that would compete with Apple's iTunes store.  Mastercard never contemplated a financial investment in Cardis.

61.     *PureSolo.*  In November and December 2014, Defendants Brown and Rosenblatt sent letters to investors reporting that Cardis was finalizing an agreement with PureSolo – a karaoke mobile application company.  The letters represented that Cardis would be "the

12

exclusive payment system for PureSolo who projects to sell a minimum of 12 Million recordings per annum at a price of $1.95 per transaction."

62.     In actuality, these representations were false.  First, there was no agreement between Cardis and PureSolo for Cardis to be "the exclusive payment system for PureSolo." PureSolo was only obligated to use Cardis' technology in PureSolo applications to the extent that Cardis was providing the marketing funds for that particular application.  Additionally, the agreement only covered Android devices and did not include Apple IOS devices.  Second, PureSolo's planned price point was $0.99 per transaction, not $1.95 per transaction, as Defendant Brown falsely represented.  Third, PureSolo did not project a figure as high as 12 million sales per year.

63.     *ByStorm*.  In November and December 2014, Defendants Brown and Rosenblatt sent letters to investors stating that Cardis was finalizing an agreement with ByStorm Entertainment to be its exclusive payment system and would "go live in late January 2015."

64.     In actuality, Cardis was not finalizing any agreement with ByStorm to be its exclusive payment system.  The companies only had one introductory meeting.

65.     *PrimaryWave*.  In November and December 2014, Defendants Brown and Rosenblatt sent letters to investors reporting:  "Cardis is in advanced negotiations to become the payment processor for Primary Wave."

66.     In actuality, PrimaryWave never entered into any negotiations with Cardis.  At the time of these representations, Cardis and PrimaryWave had held only a single meeting, and PrimaryWave was waiting for Cardis to demonstrate Cardis' technology to PrimaryWave.  That demonstration never occurred, and there are no e-mails between the parties after November 7, 2014.

13

67. *All Def Digital.* On or about December 24, 2014, Defendant Rosenblatt emailed to investors a letter written by Defendant Brown, representing the following: "ALL DEF DIGITAL (ADD) – expected to go live in February 2015[.] Cardis is finalizing its agreement to be the exclusive payment system for All Def Digital, who is the pioneer record label in its revolutionary approach to market digital videos online."

68. In actuality, nothing was expected to go live in the next two months, and Cardis was not finalizing any agreement with All Def Digital. All Def Digital was not even in the retail business.

69. *Municipal Parking Services.* From June 2016 through September 2016, Defendants Fischman and Hoffman made written representations that Cardis' technology would soon be, or had already been, embedded in Municipal Parking Services' smart parking meters in Cedarhurst, New York. For example, on September 6, 2016, in an email to a Cardis investor, Defendant Fischman wrote: "The meters go live within 30 days so revenue will begin."

70. In actuality, Cardis never rolled out its technology in Cedarhurst parking meters and was never on the verge of doing so, particularly because the town never approved the use of Cardis' technology and because MPS required, and Cardis failed to obtain, compliance with a payment industry protocol called PCI.

71. *Cumberland Farms.* From August 2016 to January 2017, Defendants Fischman, Brown, and Hoffman represented that Cardis would soon enter into a revenue-generating relationship with Cumberland Farms.

72. In actuality, Defendants had no basis in August 2016 – or ever – to represent that a deal with Cumberland Farms was in an advanced stage. Cardis had only a single meeting with Cumberland Farms, which did not occur until November 30, 2016. Thereafter, Cumberland

14

INDEX NO. 452353/2018

RECEIVED NYSCEF: 12/21/2018

Farms did not pursue a deal with Cardis.

73.     These third-party relationships were material to investors because, as described above, Cardis' business model depended on: (a) partnering with third parties; (b) those third parties generating revenue or savings through the use of Cardis' technology; and (c) Cardis earning revenue based on the performance of these third parties.

### B.     IPO or Buyout

74.     In addition to misrepresenting its prospects of revenue-generating partnerships, Cardis also falsely represented that an IPO or buyout of Cardis was on the near-term horizon.

75.     From in or around 2011 to present, Defendants repeatedly represented that an exit opportunity was around the corner, including by offering specific estimates that an exit was expected, with estimates ranging from a few months to 12 months to two years.

76.     On October 18, 2013, Defendant Rosenblatt wrote the following to an investor: "We [Cardis] now believe that the company will be doing an IPO within the next twelve months."

77.     On January 22, 2014, Defendant Brown wrote the following: "The exit strategy remains the same – an IPO or merger. Just becoming a major process in the music and mobile payment industry alone can give us a multiple billion dollar valuation and is very achievable. We think we can become a major force in the industry by the end of 2014."

78.     In February 2014, Defendant Fischman told an investor that he expected an IPO in 12 months at 10 to 30 times the value at which Cardis stock was then being sold.

79.     On May 25, 2014, Defendant Brown wrote the following to an investor: "Most important to our long term shareholders, the expanding opportunity with Mastercard can lead to the most diverse and greatest opportunities both business-wise and to a possible investment

15

which hopefully can lead to a final exit down the road."

80.     In August 2018, Defendant Fischman texted an investor that an IPO would occur in the next week.

81.     In fact, there was never an exit opportunity on the horizon.  Moreover, the notion of an exit opportunity was far-fetched for several reasons.

82.     First, Cardis failed to maintain appropriate books and records that would be necessary for these types of transactions.  Cardis did not maintain a comprehensive share registry beyond an incomplete handwritten shareholder registry on a legal notepad.  Many Cardis investors never even received stock certificates.  Similarly, Cardis failed to maintain consolidated company financial statements, or even a simple revenue and expense ledger.

83.     Second, Cardis generally failed to develop ongoing revenue streams and was instead dependent on new investor moneys.

84.     Third, any exit transaction would likely necessitate a more thorough review of Cardis' business.  That review would demonstrate that Cardis' representations about its relationships were false and that Defendant Fischman was siphoning huge sums of money for himself.

85.     These misrepresentations concerning exit opportunities were material to Cardis investors because they represented an opportunity for the investors to profit from their investments.

## II.     Defendant Fischman's Exploitation of Cardis

86.     While Cardis raised tens of millions of dollars based on its fraudulent misrepresentations, Defendant Fischman treated the Company as his own personal piggy bank.

87.     First, Defendant Fischman, with the assistance of Defendant Katz, who controlled

16

INDEX NO. 452353/2018

RECEIVED NYSCEF: 12/21/2018

the principal Cardis bank account, siphoned off huge sums to enrich Defendant Fischman personally.

88.     Cardis and Defendant Fischman represented, and investors understood, that investor funds were needed, and were to be utilized, for the development of Cardis' technology and third-party relationships.

89.     They failed to disclose, however, that Defendant Fischman was receiving huge sums to manage the Company, receiving at least $3 million through his closely-controlled company, Defendant Choshen, from January 2011 to present.

90.     There is no written agreement between Choshen and Cardis that would justify these payments, and the payments are irregular in amount, frequency, and timing. Upon information and belief, Defendant Fischman simply disbursed moneys to himself as necessary to support his own lifestyle.

91.     Second, Cardis, Choshen, Defendant Fischman, Defendant Rosenblatt, and Defendant Hoffman were all aware of, and failed to disclose that, Defendant Fischman repeatedly gave away Cardis stock to placate disgruntled investors in other failing companies backed by Defendant Fischman, thereby diluting the value of Cardis investors' stock without their knowledge.

92.     For example, Defendant Fischman gave his movie production partner $40,000 worth of Cardis shares in exchange for the partner's $40,000 investment in the movie, which failed at the box office.

93.     Similarly, Defendant Fischman directed Defendant Hoffman to tell an investor that Defendant Fischman would give the investor free Cardis stock in exchange for the investor's failed investment in another Fischman-related company.

17

94.     Likewise, on March 25, 2014, Defendant Fischman gave a Cardis investor nearly two million Cardis shares for zero consideration in exchange for the investor's June 2008 investment in another Fischman-related company, which ultimately failed.

95.     And, on August 28, 2016, a Cardis investor emailed Defendant Fischman, asking the following: "[R]egardless of a new investment, [are you] willing to offer the equivalent shares in Cardis to cover our disappointing investment in" another Fischman-related company. Defendant Fischman responded as follows: "We will issue the replacement equity for [the company], need to determine price."

96.     Third, Defendant Fischman and Defendant Katz diverted Cardis moneys to pay for Defendant Fischman's personal credit card expenses, which were substantial, and catering expenses for Defendant Fischman's personal events.   Defendant Rosenblatt was aware of Defendant Fischman's use of a corporate credit card for personal purposes because the card was issued in Defendant Rosenblatt's name.

97.     Fourth, Defendant Fischman and Defendant Katz engaged in the conversion of investor funds by fraudulently and illegally taking Cardis moneys and distributing them to others who had no right to the money.

98.     This includes the Relief Defendants who, upon information and belief, are Defendant Fischman's family members.

99.     Relief Defendant Nina Fischman received at least $2 million of Cardis' investor moneys.

100.     Relief Defendant Stuart Fischman received at least $71,000 of Cardis' investor moneys.

18

101.     Relief Defendant Rafaela Fischman received least $19,000 of Cardis' investor moneys.

102.     Relief Defendant Alexander Fischman received at least $36,500 of Cardis' investor moneys.

103.     Relief Defendant Anne Shimanovich received at least $280,000 of Cardis' investor moneys.

104.     Relief Defendant Ethel Weissman received at least $129,000 of Cardis' investor moneys.

105.     Furthermore, Defendants Fischman and Katz directed more than $1 million in investor moneys to religious charitable organizations.

106.     Finally, in addition to aiding and abetting Defendant Fischman's conversion of investor funds, Defendant Katz also converted investor funds for his own benefit.

107.     From in or about March 2011 to in or about May 2016, Defendant Katz transferred more than $2.5 million from a Defendant Katz-controlled IOLA account at Bank of America, in which Cardis' investor moneys were deposited, to Defendant Katz's accounts maintained at Signature Bank, JPMorgan Chase, and HSBC Bank USA.  The transfers included: (1) $50,000 to a Defendant Katz-controlled account at Signature Bank; (2) more than $750,000 to Defendant Katz-controlled accounts at JPMorgan Chase; and (3) more than $1.7 million to Defendant Katz-controlled accounts at HSBC Bank USA.  These transfers were frequently used to fund Defendant Katz's own personal expenses such as groceries, restaurants, and clothes.

108.     These misrepresentations and omissions were material to investors because they bore on the integrity of key Company personnel, the mismanagement of the company and lack of meaningful financial controls, and because investors believed their moneys were going towards

19

the development of the Company and not the personal enrichment of its personnel.

### III.     Defendants' Key Personnel

109.     Defendants also made misrepresentations and omissions concerning key Cardis personnel.

110.·   First, Defendants Cardis, Choshen, and Fischman failed to disclose Defendant Fischman's problematic history in the securities industry.

111.     Specifically, they failed to disclose that, in 1995, Defendant Fischman was permanently barred by the National Association of Securities Dealers ("NASD") from associating with any member of NASD in any capacity.[1]   At that time, NASD was a securities industry self-regulatory organization and was one of the predecessors of the Financial Industry Regulatory Authority, Inc. ("FINRA").  Defendant Fischman's bar was part of a settlement of NASD allegations that he had:  manipulated the price of a penny stock; failed to provide required risk disclosure statements to customers prior to effecting trades in that penny stock; failed to provide the inside bid and ask quotations for the penny stock; failed to disclose the compensation to be received by his firm and his firm's associated persons; and failed to appear and provide testimony in connection with the investigation.

112.     This information would have been significant to investors because it bore on the integrity of Cardis' principal officer and because Cardis was itself a penny stock.

113.     Second, Defendants Cardis, Fischman, Brown, Hoffman, and Rosenblatt also misrepresented the status of Defendant Brown.

114.     Defendant Brown was variously touted as serving as the Chief Financial Officer, Vice President of Finance, and/or Senior Financial Executive, but he did not perform many of

---

[1] *See* https://files.brokercheck.finra.org/individual/individual_1391938.pdf.

the core duties generally associated with these senior finance positions. For example, Cardis did

not maintain: (i) a formal share registry; (ii) a basic income statement; or (iii) comprehensive

records of its debts and obligations.

115.    Defendant Brown's true role would have been significant to an investor.

Defendant Brown was personally highly regarded for his prior work as a senior executive at a

major public company, as well as for being a significant charitable donor in the Long Island

communities in which Defendants lived and transacted business. Defendant Brown's titles

created the impression that he was highly involved with Cardis' finances, although he was not,

and that Cardis was observing traditional corporate financial formalities, which it was not.

## IV.    Defendants' Failure to Correct or Update

116.    Defendants failed to correct or update these misleading statements and omissions.

Cardis never told investors the truth that these third-party relationships were not as advanced as

claimed, that Cardis was not on the verge of monetization, and that no exit opportunity was on

the horizon. Nor did Defendants disclose Defendant Fischman's improper use of Company

moneys. In fact, on multiple occasions, when confronted with claims of malfeasance,

Defendants reaffirmed the misrepresentations and omissions.

117.    In summer 2012, Cardis investors raised concern as to "what funds have been

spent to date trying to get the Company off the ground," including "[w]hat compensation" was

received by the officers, the "hype that [investors] received at the time of investment," and that

Cardis was a "ponzi scheme." Defendant Brown, Defendant Rosenblatt, and others met with

Cardis investors to dissuade them from these concerns.

118.    In July 2014, a Cardis investor wrote Defendant Fischman, Defendant Hoffman,

and Defendant Rosenblatt, raising his concern that multiple investors had called him "to inquire

about whether I know anything about the operation you guys are running, implying that they believe that you guys are involved in a real fraud." The investor noted that "[t]hese people are getting very restless . . . because . . . you guys have been telling them you are very close to a great deal for many years now and they no longer believe you."

119.    Defendant Brown, Defendant Rosenblatt, and Defendant Fischman then coordinated a response dismissing the concerns as the product of a "few, minority, [sic] investors who continue to be angry at us, mostly because their investment has not been realized to date." They went on to reject "accusations of a PONZI scheme" as "absurd on every level." They affirmed the accuracy of their past representations and also made additional misrepresentations about Cardis' business prospects.

120.    On September 24, 2015, a Cardis investor emailed Defendant Brown asking for the "latest on Cardis" and whether it was "a complete loss," while mentioning a recent investor lawsuit. Defendant Brown, copying Defendant Rosenblatt, responded that the lawsuit claiming fraud was "frivolous," while claiming that Cardis' relationship with Roc Nation was "developing" and ongoing. In fact, the lawsuit had merit, and Cardis' relationship with Roc Nation was long over.

121.    On February 28, 2018, a Cardis investor recorded a telephone conversation with Defendant Brown. The investor asked "what happened to the cash" investors put into Cardis. Defendant Brown responded by detailing the Company's large budget and staff, while failing to disclose the substantial misuse of investor funds. The investor also questioned Defendant Brown about various investor lawsuits against Cardis and its principals. The investor asked: "After reading those lawsuits, why should we think that the company has any future?" In response, Defendant Brown told the investor "the lawsuits were not the most credible lawsuits," attributing

22

them to "angry investors." Defendant Brown later told the investor "none of those lawsuits have any merit to them." In fact, there was substantial merit to the investor lawsuits.

122. These misrepresentations and omissions were material to investors because they bore directly on Cardis' viability.

## FIRST CAUSE OF ACTION
### Material Misrepresentations – GBL §§ 352(1) and 352-c

123. Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

124. Defendants together, and each of them individually, made materially false and misleading representations, statements, and promises, and omitted to state material information, to investors and potential investors about the nature of the securities, and the risks and potential returns of investing in those securities, issued, offered, and sold by Defendants. These misrepresentations and omissions were part of a single continuing scheme to defraud investors.

125. The foregoing acts and practices of Defendants and their agents and employees, consisting of materially false and misleading oral and written representations, statements, promises and omissions, constitute fraudulent acts and practices as defined in GBL §§ 352(1) and 352-c, are illegal and prohibited acts and practices pursuant to GBL §§ 352-c and 359-g(2), and are subject to the equitable remedies of permanent injunctive relief and restitution set forth in GBL § 353.

126. Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Repeated and Persistent Fraud and Illegality – Executive Law § 63(12)

127. Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

128. The acts and practices alleged herein of each Defendant constitute conduct

23

proscribed by Executive Law § 63(12), in that Defendants engaged in repeated fraudulent acts, in violation of GBL § 352(1), or repeated illegal acts, in violation of GBL § 352-c, or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting, or transaction of business. These misrepresentations and omissions were part of a single continuing scheme to defraud investors.

129.    Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

### THIRD CAUSE OF ACTION
Actual Fraud

130.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

131.    As alleged herein, Defendants made material misrepresentations and omitted material facts as part of a single continuing scheme to deceive investors.

132.    Defendants made those material misrepresentations and omissions intentionally, knowingly, or recklessly.

133.    Upon information and belief, investors did in fact rely on Defendants' misrepresentations and omissions in making their investment and business decisions and such reliance was justifiable and reasonable.

134.    Investors suffered economic damages as a result.

135.    Defendants' conduct constitutes actual fraud under New York common law.

136.    Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

### FOURTH CAUSE OF ACTION
Equitable Fraud

137.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

24

138.    As alleged herein, Defendants made material misrepresentations and omitted material facts as part of a single continuing scheme to deceive investors.

139.    Upon information and belief, investors did in fact rely on Defendants' misrepresentations and omissions in making their investment and business decisions and such reliance was justifiable and reasonable.

140.    These misrepresentations and omissions of material facts as alleged herein constitute equitable fraud under New York common law.

141.    Plaintiff and the public have been, and are being, irreparably harmed by the aforesaid acts and practices and have no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Constructive Fraud

142.    Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

143.    Defendant Cardis and its officers and/or directors owed a fiduciary duty to Cardis shareholders.

144.    As alleged herein, Defendants made material misrepresentations and omitted material facts in communications with Cardis shareholders as part of a single continuing scheme to deceive investors.

145.    Upon information and belief, Cardis shareholders did in fact rely on Defendants' misrepresentations and omissions in making their investment and business decisions concerning Cardis, including by purchasing additional stock in Cardis, and such reliance was justifiable and reasonable.

146.    These misrepresentations and omissions of material facts, by fiduciaries, as alleged herein, constitute constructive fraud under New York common law.

147.    Plaintiff and the public have been, and are being, irreparably harmed by the

25

aforesaid acts and practices and have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants and Relief Defendants as follows:

A. Permanently enjoining Defendants from directly or indirectly engaging or attempting to engage in any manner in the issuance, exchange, sale, offer to sell, purchase, offer to purchase, promotion, negotiation, advertisement, investment advice, investment management, or distribution of any stocks, bonds, notes, evidences of interest or indebtedness, foreign currency orders, calls or options, or any other securities or commodities within or from the State of New York;

B. Permanently enjoining Defendants from directly or indirectly engaging or attempting to engage in any manner in the securities or commodities business within or from the State of New York as a broker, dealer, issuer, investment adviser, or investment manager, or as an officer, director, principal, controlling person, agent, affiliated person, consultant, or salesman of a broker, dealer, issuer, investment adviser, or investment manager;

C. Permanently enjoining Defendants from directly or indirectly engaging or attempting to engage in any manner in the writing, publishing, preparing, selling, or distributing any letter or other literature advising, suggesting, or in any other manner communicating advice within or from the State of New York with respect to the purchase or sale of securities or commodities; and from forecasting, advising, or in any other manner suggesting either orally or in writing any method or methods to be used in connection with the purchase or sale of securities or commodities;

26

D.    Pursuant to GBL § 353(3), directing Defendants, jointly and severally, to make restitution to defrauded investors of all moneys and property obtained directly or indirectly by the fraudulent acts and practices complained of herein, in an amount to be determined;

E.    Pursuant to Executive Law § 63(12), directing Defendants, jointly and severally, to make restitution and pay damages to defrauded investors of all moneys and property obtained from them, directly or indirectly as a result of the fraudulent and illegal acts and practices complained of herein, in an amount to be determined;

F.    Pursuant to the common law of the State of New York, directing all Defendants, jointly and severally, to pay damages suffered by defrauded investors as a result of the fraudulent acts and practices complained of herein, in an amount to be determined;

G.    Pursuant to the Court's equitable powers, directing Relief Defendants to disgorge all moneys and property received directly or indirectly from Defendants, or any of them, that constituted ill-gotten gains resulting from Defendants' fraudulent acts and practices against the defrauded investors, and to which moneys and property Relief Defendants have no legitimate claim, in amounts to be determined at trial, so that such moneys and property can be restored to the defrauded investors;

H.    Pursuant to GBL § 353-a, directing the appointment of a receiver to receive, for the benefit of defrauded investors, to take title to, and liquidate for the benefit of defrauded investors, all moneys and property derived by Defendants and Relief Defendants, or any of them, by means of any of the fraudulent acts and practices alleged herein, including also all moneys and property with which such moneys and property have been mingled, because such moneys and property cannot be identified in kind because of such commingling, together with any or all books of account and papers relating to such moneys and property;

27

I.      Directing that each Defendant pay Plaintiff an additional allowance of $2,000 pursuant to Civil Practice Law and Rules § 8303(a)(6), and an additional allowance of $2,000 pursuant to GBL § 353(1);

J.      Permitting Plaintiff to make further applications for such other and further relief as it appears to Plaintiff is proper and necessary for the enforcement of the judgment; and

K.      Awarding such other and further relief to Plaintiff as the Court may deem just and proper in the circumstances.

Dated: New York, New York
       December 21, 2018

                    BARBARA D. UNDERWOOD
                    Attorney General of the State of New York
                    *Attorney for Plaintiff*

              By: _____
                    Jeffrey A. Novack
                    Assistant Attorney General
                    Investor Protection Bureau
                    (212) 416-6178
                    jeffrey.novack@ag.ny.gov

                    Mary Kay Dunning
                    Senior Enforcement Counsel
                    Investor Protection Bureau

                    Verle Johnson
                    Assistant Attorney General
                    Investor Protection Bureau

                    *Attorneys for Plaintiff*
                    *People of the State of New York*

Of Counsel:
Cynthia Hanawalt
Bureau Chief
Investor Protection Bureau

28

Stuart Zisholtz, Esq.
ZISHOLTZ & ZISHOLTZ, LLP
200 Garden City Plaza, Suite 408
Garden City, New York 11530
Tel: 516-741-2200
Fax: 516-746-1024
stu@zzllp.com
*Attorneys for Shalom S. Maidenbaum*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

SHALOM S. MAIDENBAUM,

                              Plaintiff,

      -against-

AARON FISCHMAN, NINA FISCHMAN
LAWRENCE KATZ, THE LAW OFFICE OF
LAWRENCE KATZ, P.C., THE LAW OFFICE
OF LAWRENCE KATZ, ESQ., PLLC and CHOSHEN
ISRAEL, LLC,

                             Defendants.

-------------------------------------------------------------------------x

Docket No. 2:18-cv-02911
JFB-GRB

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR AN ORDER PURSUANT TO FRCP RULE 12(b)(6),
FRCP RULE 12(e), FRCP RULE 8(a), FRCP RULES 9(a) – (d) AND FRCP RULE 11**

## PRELIMINARY STATEMENT

Plaintiff Shalom S. Maidenbaum submits this Memorandum of Law in opposition to Defendants' two pending motions. The first motion seeks dismissal of the action under FRCP Rule 12(b)(6), or alternatively, seeks a more definite statement pursuant to FRCP Rule 12(e). The second application requests sanctions under FRCP Rule 11 and 28 U.S.C. § 1927.

Plaintiff filed a Complaint alleging five causes of action (the "Complaint"). The first three claims for relief were made pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), claiming that Defendants damaged Plaintiff in violation of 18 U.S.C. §§1961-1968. Additionally, the Complaint lists an ancillary claim for legal malpractice and another for breach of fiduciary duty against defendants Lawrence Katz, The Law office of Lawrence Katz, P.C. and The Law Office of Lawrence Katz, Esq. PLLC.

Defendants filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint ("FRCP 12(b)(6)"), alleging that the Complaint failed to state a claim. Alternatively, pursuant to Federal Rule of Civil Procedure 12(e), Defendants requested an order directing Plaintiff to produce a more definite statement of the Complaint ("FRCP 12(e)"), alleging that the Complaint is so vague and ambiguous that the Defendants are unable to reasonably prepare an Answer ("Defendants' Motion"). The Defendants also seek sanctions under Rule 11.

As discussed more fully below, the Complaint clearly states a claim showing that Plaintiff is entitled to relief, as required by Federal Rule of Civil Procedure 8(a) ("FRCP 8(a)"), and therefore, Defendants' motion to dismiss should be denied. Moreover, because the Complaint is clear and unambiguous and affords ample opportunity for Defendants to prepare an Answer, Defendants' motion pursuant to FRCP 12(e) should be denied. For these reasons,

Plaintiff respectfully requests Defendants' Motion be denied in all respects.

The motion to dismiss relies upon a string of emails between counsel for the parties, discussing attempts to negotiate a settlement in this action. As such, Defendants' utilization of the same violates FRCP Rule 408 [Compromise Offers and Negotiations]. Additionally, the factual predicate of the motion – that the damages sought in this action are the same for which confessions of judgment were obtained in the New York State Supreme Court in Nassau County – is simply wrong. With respect to the allegations in the complaint, they are simply and adequately plead, and, for the purposes of these motions must be deemed to be true.

The motion for sanctions is equally without merit, and counsel for Defendants should be mindful that pursuant to FRCP Rule 11(c)(2) the Court "may award to the prevailing party the reasonable expenses, including attorney's fees, incurred" in connection with the defense of the motion for sanctions.

Mr. Maidenbaum's position is that the Complaint advances meritorious claims against all of the defendants and that it is adequately plead. As will be demonstrated, this claim is buttressed by a recent filing by the New York State Attorney General ("NYAG") against the defendants in this action and others, concerning much of the same general conduct that is addressed in this action, albeit from a different perspective.

## THE USE OF EMAILS IS IMPROPER

Defendants' counsel relies upon a string of emails between July 11, 2018 and July 16, 2018. At the crux of these emails are two emails from July 13, 2018, which encompass the context of the emails. In the first of these emails, Defendants' counsel implores Plaintiff's counsel "[o]f greater importance, is your client interested in settling the judgments, litigation, etc.?" Plaintiff's counsel responded just a few minutes later "[y]es. Give me an offer and I will

3

talk to my client."

Instead, Mr. Huebner focuses in solely upon the last email exchange of July 16, 2018 wherein Plaintiff's counsel, Stuart S. Zisholtz, appears to state that the two actions cover the same damages. They do not. Mr. Zisholtz was confirming that he would globally settle all of the claims together, as the parties were exploring sums less than the judgment amounts. Perhaps this is precisely why FRCP Rule 408 prohibits the use of this kind of material.

FRCP Rule 408 [Compromise Offers and Negotiations] provides:

> "**(a) Prohibited Uses.** Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> **(1)** furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> **(2)** conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> **(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

Clearly, Defendants' counsel's use of the emails is violative of this FRCP Rule 408. The emails do not fall within the exceptions enumerated in subsection (b) of FRCP Rule 408.

Moreover, the judgments in the Nassau County Supreme Court action are for four (4) confessions of judgments given in connection with loans given to an entity known as Cardis

Enterprises International, in its various iterations and Defendant Aaron Fischman. This action has nothing to do with those loans. Rather, this action is centered on investment monies given to Defendant Aaron Fischman, through Defendants Lawrence Katz, who set up an escrow account that became Mr. Fischman's personal piggy bank. The monies in this action center on monies sent for investments in Cardis and another entity known as Epoint, which were never turned over to either Cardis or Epoint, but instead were transferred to Defendant Nina Fischman, among others.

As of this writing, the account held in Mrs. Fischman's name in HSBC and JPMorgan Chase show that more than $4 Million was transferred to Mrs. Fischman over a period of eight (8) years, even though she had nothing to do with Cardis, Epoint, or even Defendant Choshen Israel. Lest there be any doubt in the veracity of these allegations, the Court's attention is drawn to a recent filing by the NYAG on December 21, 2018 against the Defendants in this action, and others, in what can only be described as a Ponzi Scheme. (Copies of the Summons and Complaint, and Request for Judicial Intervention in the NYAG's action are collectively annexed hereto as Exhibit "A").

In paragraph 2 of his memorandum in support of the motion to dismiss, Defendants' counsel states:

> It is uncontested that Plaintiff holds four (4) confessions of judgment by Aaron [Fischman], which at the time of its (sic) entry amounted to $2.575 million ($2,575,000.00) at 8% interest ("judgment"). Now, the confessions of judgment with post judgment interest amount to approximately $3,883,759.12.

First, Mr. Maidenbaum does not hold "confessions of judgment." He holds judgments, which were issued by confession. Second, the amounts of the judgments when recorded were

not $2,575,000.00. The face amount of the judgments was $3,274,540.78 when recorded, as they all factored in pre-judgment interests. Moreover, the judgments do not earn post-judgment interest at eight percent (8%). They earn post-judgment interest at nine percent (9%) in accordance with New York CPLR § 5004.[1]

Contrary to Defendants' assertion, the monies that resulted in the four (4) judgments and the damages sought in this action are not the same. The judgments all stemmed from loans advanced by Mr. Maidenbaum to the Cardis entities or Mr. Fischman, of which there were multiple defaults in payments. All of the loans, for which promissory notes were issued, ultimately resulted in confessions of judgment.

Conversely, none of the monies sought in this actions were loans to anyone. They were monies earmarked by Mr. Maidenbaum for investment in either Cardis or Epoint. Those monies, while given to Mr. Katz as an escrow agent, were never transferred to the intended recipient. If they had been this case would be solely one of securities fraud, for which no RICO relief is available.

As set forth in the complaint in this action:

> 18.    Defendant AF set up another entity known as Choshen Israel Group, LLC ("Choshen"), which he alone controlled. Choshen was set up as a vehicle for Mr. Fischman to hid assets and income. It served no other functionality.
>
> 19.    Over the course of several years, beginning at least as far back as 2009, and continuing into 2016, AF solicited investments into the Cardis entities totaling over $70 Million.
>
> 20.    AF explained to investors that because Cardis was a foreign corporation they did not have a bank account in the United States and the monies had to

---

[1]    As of this writing the amount owed on the judgments is in excess of $4 Million.

be deposited into his lawyer's escrow account. That lawyer was the Defendant Lawrence Katz ("Katz").

21.     While all of the funds were earmarked by investors for Cardis, Katz disbursed them as AF directed. The lion's share of the monies raised did not in fact go to Cardis. Rather, they were sent to AF, Choshen, NF, the Fischmans' children, or to pay for the Fischmans' lavish lifestyle, which included a vacation home in Sullivan County, New York, and an apartment worth several million dollars in Jerusalem, Israel.

22.     In addition to the Cardis entities, AF also raised money for an entity known as Epoint Payment Corp. ("Epoint"). Epoint was also a technology driven company that AF claimed to have come up with, together with an individual named David Crocket, a Vice President at the FIS Global Business Solutions, a company with a net worth in the several billions of dollars.

23.     Plaintiff, Shalom S. Maidenbaum was one of the investors duped by the scheme concocted by AF, Katz and NF.

24.     In each instance Mr. Maidenbaum tendered checks to Katz for investment in Epoint. Yet, Mr. Maidenbaum was shocked to find out that notwithstanding his direction to Katz that the deposits were for the purchase of an equity interest in Epoint, Katz disbursed a considerable sum of the funds directly to AF.

25.     Over the course of the many years the scheme between the Defendants was going on, AF and Katz funneled millions of dollars into the bank accounts of Defendant NF, who was not during any of the period, gainfully employed outside the home, and never held any position with Cardis.

26.     Mr. Maidenbaum's payments to Katz for investments, variously in Cardis and Epoint, commenced in the fall of 2009 and continued through September 10, 2015. Mr. Maidenbaum did

7

not learn that his funds did not all find their way to his Epoint investment until May, 2016.

27. The scheme and enterprise operated by Defendants was for the express purpose of enriching themselves at the expense of investors, without actually sending all of the monies where they were earmarked, and for the added purpose of defrauding the taxing authorities – both Federal and State.

Yet, Defendants' counsel states in paragraph 5 of his memorandum that "[t]he Complaint herein is deliberately vague and ambiguous to make the alleged claims appear from the transactions upon which the confessions of judgment rest."

Inasmuch as the confessions all stemmed from loans and the Complaint centers only on misappropriated investment monies (i.e. not loans), it is completely disingenuous for Defendants' counsel to claim that the Complaint is "deliberately vague and ambiguous" or that it is vague and ambiguous at all.

Defendants' attorney next purports to analyze the Complaint, prefacing his analysis with two questions: Are there other parties of interest involved? Does the Plaintiff have the capacity to sue?

With respect to the first question, it is fair to conclude, particularly after perusing the NYAG's Complaint, that there are other parties of interest, i.e., Defendants' fraudulent and likely criminal scheme defrauded many other individuals whose investment monies were never actually invested in the entities they were designated for. The next question is answered by a resounding "yes". The plaintiff does have the capacity to sue. And no, Mr. Maidenbaum is not seeking claims on behalf of Cardis, nor is there any reading of the Complaint from which such a ludicrous interpretation could be gleaned.

8

Defendants' counsel correctly points out that "Cardis" is not named as a defendant in the Complaint; it is not. Rather Choshen, the vehicle set up by the Defendants to further their fraudulent scheme, is a Defendant, which utilized and enticed investors with the prospect of investing in Cardis, a real company, that Mr. Fischman had a fiduciary responsibility to, as a member of the Board of Directors. Unfortunately, Mr. Fischman, whose dishonesty previously resulted in a lifetime ban from FINRA[2], utilized his connection to Cardis to defraud Mr. Maidenbaum and others.

In paragraph 9 of his memorandum, Defendants' counsel claims that the Complaint alleges that Mr. Maidenbaum was victimized by Defendants "without ever alleging the acts Cardis (sic) committed. . . ." To be clear, Cardis did not commit the fraudulent acts. That was the purview of Defendants. Their counsel references paragraph 63 of the Complaint, but ignores the fact that all prior allegations are subsumed into each claim for relief. The fraudulent acts are those set forth in paragraphs 18 through 27 of the Complaint, as set forth above.

In paragraph 10 of his memorandum, Defendants' attorney references Epoint Payment Corp. ("Epoint"), FIS Global Business Solutions ("FIS") and David Crocket, asking why they are not defendants. For one thing, these entities and Mr. Crocket were not in any manner under Mr. Fischman's control. However, as outlined in the Complaint, Mr. Fischman utilized their *bona fides* in order to dupe Mr. Maidenbaum into investing in yet another entity, and when Mr. Maidenbaum in fact did invest, Mr. Fischman again, with aid of Katz, siphoned off the investment monies.

Defendants' counsel states in paragraph 30 of his memorandum that "Defendants cannot intelligently comprehend against who the Complaint is directed, employees of Cardis or nonemployees." Again counsel is disingenuous. Messrs. Fischman and Katz, along with the

---

[2] *See,* https://files.brokercheck.finra.org/individual/individual_1391938.pdf

help of Mrs. Fischman, utilizing Defendant Choshen, funneled millions of dollars to Mrs. Fischman's bank accounts. While the NYAG's action claims the amount improperly siphoned off from Katz's escrow account to Mrs. Fischman was in excess of $2 Million, the actual amount, between late 2007 through mid 2016 was actually in excess of $4 Million. Moreover, during that same period of time over $11 Million dollars was wired from Katz's escrow accounts to Defendant Choshen.

Had Defendants not siphoned off those funds, Cardis may very well have achieved what the investors had hoped. Unfortunately, as alleged in the NYAG's complaint, it was cash starved. Perhaps Messrs. Fischman and Katz deigned themselves the next Biolostock and Bloom[3], betting that they could make more money on a failure than a success.

This Court addressed itself to the utilization of a civil RICO claim in *Moss v. BMO Harris Bank, N.A.*, 258 F.Supp.3d 289, 301 (E.D.N.Y. 2017). In that case the Court found the RICO elements lacking with respect to the "enterprise." Specifically, this Court observed:

> Further, in addition to alleging a common fraudulent purpose, a plaintiff must "provide [the Court] with . . . solid information regarding the hierarchy, organization, and activities of [an] alleged association-in-fact enterprise." *First Capital Asset Mgmt.*, 385 F.3d at 174. The SAC fails on this account, as well, because besides describing the roles played by the various ACH Network participants, plaintiff has not set forth any allegations, outside of conclusory statements, to support a plausible claim that those entities formed an "'ongoing organization, formal or informal,'" or any allegations tending to show that "'the various associates [of the alleged enterprise] function as a continuing unit.'" *Id.* at 173 (quoting *Turkette*, 452 U.S. at 583). Although a RICO enterprise need not have a formal hierarchy, *see Boyle*, 556 U.S. at 948, plaintiff only alleges that "participants in the ACH Network Enterprise preserve close business

---

[3] From the famed Broadway show and movies, "The Producers."

10

> relationships and maintain established and defined
> roles within the enterprise" (SAC ¶ 108). This
> allegation is insufficient to state a RICO claim.

Conversely, in this case the hierarchy is spelled out. Mr. Fischman ran the enterprise. Mr. Katz effectuated the fraudulent activity, using the cover of his law practice. Mrs. Fischman was the willing recipient of the funds diverted. Plaintiff Shalom Maidenbaum was the victim, both with respect to the investment monies he earmarked for Cardis and Epoint that were never invested in those entities after being deposited into Katz's escrow account – instead, they were diverted to Mrs. Fischman or Choshen – and by the fact that the entities he sought to invest in became cash starved and were unable to succeed.

## THE MOTION TO DISMISS AND FOR A MORE DEFINITE STATEMENTSHOULD BE DENIED

The scope of a court inquiry on a motion to dismiss is narrowly circumscribed. The sole criterion is whether the facts as alleged in the complaint are within any cognizable legal theory. *See Fitzgerald v. Barnstable Sch. Comm.* 555 U.S. 246, 129 S.Ct. 788, 172 L.Ed2d. 582 (2009) The complaint must be construed liberally and the Court must resolve all reasonable doubts and inferences in the pleader's favor and view the pleading in the light most favorable to the non-moving party. Id. No claim will be dismissed merely because the trial judge does not believe the allegations in the complaint or that recovery is remote or unlikely. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed2d. 929 (2007)

The burden of proof lies with the moving party. In fact, even if the non-moving party fails to oppose the motion, the Court must still determine whether dismissal is appropriate. See, *Ragin v. New York Times Co.,* 923 F.2d. 995, (2d. Cir. 1991)

Here, the Defendants have failed miserably in seeking to dismiss the Complaint. The

allegations set forth in the Complaint clearly establish the various causes of action.

The Complaint clearly states five factually sufficient claims for relief. Accordingly, Defendants' Motion to Dismiss the Complaint for failure to state a claim should be denied.

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Blau v. Allianz Life Ins. Co. of N. Am.,*124 F. Supp. 3d 161, 173 (E.D.N.Y. 2015) (quoting *Keiler v. Harlequin Enters.*, 751 F.3d 64, 70 (2d Cir.2014)). "Fair notice" is "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." *Id.* (quoting *Wynder v. McMahon,* 360 F.3d 73, 79 (2d Cir.2004).

The purpose of a FRCP 12(b)(6) motion is to test the legal sufficiency of a plaintiff's claims for relief. *Blau* at 174, (quoting *Patane v. Clark,* 508 F.3d 106, 112 (2d Cir.2007)). In reviewing a complaint, the court must accept as true all allegations of fact, and draw a reasonable inference from these allegations in favor of the plaintiff. Id. (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

A complaint will survive a FRCP 12(b)(6) motion if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"The court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'". *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985); (quoting *Conley*

*v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957)) see also, *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052–53 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S. Ct. 86, 130 L.Ed.2d 38 (1994). In deciding a FRCP 12(b)(6) motion, it is not the court's function to weigh the evidence that might be presented at trial and decide whether a plaintiff will ultimately prevail. Rather, the court's role is merely to determine whether the complaint itself is legally sufficient and if the claimant is entitled to offer evidence to support the claims made in the complaint, see *Goldman v. Belden,* at 1067, supra at 1067; see also, *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). In doing so, it is well settled that the court must accept the allegations of the complaint as true, and construe all reasonable inferences in favor of the plaintiff. See, *Leeds v. Meltz,* 85 F.3d 51 (2d Cir.1996); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); see also, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1099 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989)

Here, the Complaint complies with FRCP 8(a) and clearly states five factually sufficient claims for relief. If all of the allegations of fact in the Complaint are accepted as true, the Court could draw a reasonable inference in favor of the Plaintiff and that the Defendants are liable for the conduct alleged.

### Racketeer Influenced and Corrupt Organizations (RICO)

Section 1962 of Title 18 of the United States Code provides:

(a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of

13

such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

To bring a RICO claim, a plaintiff "must allege (1) that the defendant (2) through the commission of two or more acts (3) constituting a `pattern' (4) of `racketeering activity' (5) directly or indirectly to conduct or participate in (6) an `enterprise' (7) the activities of which affect interstate or foreign commerce." *Crawford & Sons, Ltd. Profit Sharing Plan v. Besser,* 216 F.R.D. 228, 233 (E.D.N.Y.2003) (Spatt, J.) (citing 18 U.S.C. § 1962(a)-(c).

The RICO statute defines "racketeering activity" to include wire fraud. 18 U.S.C. §

1961(1)(B). Where the RICO claim alleges wire fraud, as is the case here, a plaintiff must prove that defendants (1) participated in a scheme to defraud; (2) acted `with knowledge' that the use of the wires would follow in the ordinary course of business; and (3) the use of wires was for the v. purpose of executing the scheme or fraud alleged. *USA Certified Merchants, LLC v. Koebel,* 262 F.Supp.2d 319 at 333 (citing *In re Sumitomo Copper Litig.,* 995 F.Supp. 451, 455 (S.D.N.Y.1998) (Pollack, J.)).

Like allegations of fraud, "allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993) (citing *Official Publications, Inc. v. Kable News Co., Inc.,* 692 F.Supp. 239, 245 (S.D.N.Y.1988) As a result, "[a] complaint alleging mail and wire fraud must plead facts that give rise to a strong inference that the defendant possessed fraudulent intent." *Id.*

The claims asserted in this lawsuit mirror the statute and follow the controlling law. No basis exists to dismiss the Complaint.

With respect to the Fourth Cause of action for Legal Malpractice, the Complaint is clear and unequivocal. The Defendants fail to address any misunderstandings or confusion. The fact is that the funds were delivered to the Defendant, Lawrence Katz, to be used solely for investment purposes. Instead, Lawrence Katz, in conjunction with the other Defendants, helped themselves to millions of dollars.

The Fifth Cause of action explains clearly and concisely that Lawrence Katz and his controlling entities had a fiduciary duty to the Plaintiff which he violated. The Plaintiff cannot be any clearer.

## THE COMPLAINT IS CLEAR AND UNAMBIGUOUS AND
## AFFORDS DEFENDANTS AMPLE OPPORTUNITY TO RESPOND

FRCP 12(e) allows a party to "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). FRCP 12(e) is designed to prevent unintelligibility in complaints in order for a party to interpose a responsive pleading.

As previously noted, Federal Rule of Civil Procedure 8(a)(2) only requires a plaintiff to plead "a short and plain statement of the claim", so as to provide a defendant with fair notice of the plaintiff's claim and the grounds upon which it rests. *Conley v. Gibson,* 355 U.S. 41, 47, 2 L.Ed.2d 80, 78 S.Ct. 99 (1957). Thus, a FRCP 12(e) Motion should be denied if a complaint comports with the liberal pleading requirements of Rule 8(a). See *Vapac,* 2000 U.S. Dist. LEXIS 10027, at *17 (citing *Tom Kelley Studios Inc. v. Int'l Collectors Soc'y Inc.,* No. 97 Civ. 0056, 1997 U.S. Dist. LEXIS 14571, at *2 (S.D.N.Y. Sept. 25, 1997)).

A motion for a more definite statement under FRCP 12(e) "is appropriate in narrow circumstances..." *Blau v. Allianz Life Ins. Co. of N. Am.,* supra. "An underlying aim of the Federal Rules is to discourage motions to compel more definite complaints and to encourage the use of discovery procedures to apprise the parties of the basis for the claims made in the pleadings." *Home Nature Inc. v. Sherman Specialty Company,* 322 F. Supp.2d 260, 264 (E.D.N.Y. 2004) (quoting *Asip v. Nielsen Media Research, Inc.,* No. 03 Civ. 5866, 2004 U.S. Dist. LEXIS 2350, at *7 (S.D.N.Y. Feb. 17, 2004).

FRCP 12(e) is designed to remedy unintelligible pleadings, not to correct for lack of detail. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 399 F.Supp 2d 242 134 (S.D.N.Y. 2005).

FRCP 12(e) motions are generally disfavored by the courts because of their dilatory nature. *Sanchez v. New York City,* 1992 WL 167283, at *1 (E.D.N.Y. June 30, 1992) (ruling that Rule 12(e) motions are "disfavored largely because they often add little that discovery could not provide, while creating delay"). "Unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it," a motion for a more definite statement should not be granted. *Advanced Commc'n Tech., Inc. v. Li,* 2005 WL 3215222, at *3 (S.D.N.Y. Nov. 30, 2005) (quoting *Bower v. Weisman,* 639 F. Supp. 532, 538 (S.D.N.Y. 1986)); see also *DiPetto v. United States Postal Serv.,* 383 Fed. Appx 102 (2d Cir. 2010).

Here, the Complaint is clear and unambiguous and affords Defendants ample opportunity to respond with an Answer. Defendants are in no way prejudiced by a lack of specificity in the Complaint. If Defendants are claiming lack of detail in the Complaint, that is not the intended purpose of FRCP 12(e). Instead, that is the purpose of discovery. Any lack of detail will be resolved during discovery.

For these reasons, Plaintiff respectfully requests the Court to deny Defendants' FRCP 12(e) Motion and allow the discovery process to apprise the parties of the factual basis of the claims made in the Complaint.

## RESPONDING TO THE MOTION FOR SANCTIONS

Defendants' counsel, either through mistake or intentional obfuscation, takes the position that Plaintiff Shalom Maidenbaum is utilizing several forums to recover the same monies. This is not true. There are three components to Mr. Maidenbaum's actions to recover monies owed to him.

First, Mr. Fischman executed four (4) promissory notes in connection with monies lent to

either the Cardis entities, Choshen and/or himself. Mr. Fischman also executed four (4) confessions of judgment in favor of Mr. Maidenbaum. Two of the confessions were in the name of the three Cardis entities, Choshen and Mr. Fischman. Two of the confessions were only in Mr. Fischman's name. All of these notes were defaulted upon, and as a result, in June 2016 Mr. Maidenbaum entered four (4) separate judgments in the New York State Supreme Court in Nassau County.

Second, Mr. Maidenbaum has engaged in post-judgment proceedings seeking records from the Fischmans and Mr. Katz. They have ignored all of the subpoenas served and they are the subject of contempt proceedings ongoing.

Mr. Maidenbaum next commenced an enforcement proceeding in Jerusalem, Israel, where the Fischmans own a vacation home worth several million dollars. Those proceedings are ongoing, and only seek to enforce the New York State judgments issued in connection with the defaulted loans.

Third, Mr. Maidenbaum commenced this action. None of the monies in this action are related to the judgments entered in the New York State Supreme Court. Rather, this action seeks damages for monies tendered for investments into either Cardis or Epoint that Defendants diverted.

There is no legal argument to make here since the factual predicate upon which the motion for sanctions is based is simply wrong.

Moreover, Defendants' counsel's reference to Defendants' defalcations of other investors, as an attempt to again obfuscate the issues, is also disingenuous. These allegations were for background and informational purposes only. While it is possible that other investors may also choose to either join this lawsuit or sue independently, Mr. Maidenbaum does not

purport to speak for them in this action.[4]

As set forth in the accompanying declaration of Stuart S. Zisholtz, when he answered "Yes" to Defendants' counsel's email on July 16, 2018, he was advising Defendants' counsel that the settlement of the judgments would encompass the settlement of everything. As mentioned *infra*, it was palpably improper for Defendants' counsel to include those emails, which constituted settlement discussions. This action was violative of FRCP Rule 408.

Citing *Sec. & Exch. Comm'n v. Thompson*, 238 F.Supp.3d 575 (S.D.N.Y. 2017), Defendants' counsel postures that the previous action involved the same parties or those in privity to them and that the claims asserted in the subsequent action were, or could have been asserted in the prior action. This statement is incorrect. First, there was no previous action – there were confessions of judgment filed. There was no summons and complaint, there was no answer. Rather, there were four (4) judgments issued in connection with four (4) confessions of judgment executed by Defendant Aaron Fischman. In fact, it would have been impossible to enter a confession of judgment on anything other than a sum certain.

Defendants' counsel states that "Maidenbaum and his counsel know full well that the transactions and events giving rise to this Complaint are duplicitous of the transactions that led to the Judgments." In actuality, it is Defendants Aaron Fischman and Lawrence Katz (also an attorney) and possibly Mrs. Katz and Mr. Huebner, who know or should know full well that the two actions are not related. The judgments were issued in connection with loans. This action was commenced to address investment monies siphoned away from the investments by Defendants.

---

[4] It is noted that the determinations in this action could nonetheless have a *res judicata* or *collateral estoppel* effect.

Defendants' counsel further claims that only conclusory allegations have been made. This is also false. Perhaps counsel should again read paragraphs 18 through 27 of the Complaint. Reference is made to multiple investments by Mr. Maidenbaum, which were siphoned off from either Cardis or Epoint to fund Defendants' lavish lifestyle.

## CONCLUSION

For all the reasons stated above, Defendants' motions should be denied in their entirety. Moreover, consistent with the provisions of FRCP Rule 11(c)(2), this Court should award to Mr. Maidenbaum the reasonable expenses, including attorney's fees, incurred in connection with the defense of the motion for sanctions.

Dated:  Mineola, New York
          January 4, 2019

                                             ZISHOLTZ & ZISHOLTZ, LLP

                              By: _____
                                             STUART S. ZISHOLTZ (7533)
                                             *Attorneys for Plaintiff*
                                             200 Garden City Plaza, Suite 408
                                             Garden City, New York 11530
                                             (516) 741-2200